Good morning, your honors. May it please the court, my name is Timothy Scott on behalf of the appellant, Mr. Lombera-Valdovinos. We're asking for reversal for three reasons in this case. The first is that the government concedes that it repeatedly misstated the law in closing argument and urged an unlawful basis for conviction, and that error was not harmless. Second, the jury instructions that the court gave in this case were misleading or, at a minimum, weren't sufficient to present the defense theory of the case or to counteract the admitted misconduct. And then third, under what the government now concedes is the correct reading of the law, insufficient evidence supports its conviction. Now, first, as to the conceded error that the government partook in in closing arguments, the government admits that it was improper to tell the jury that the desire to go to jail is the desire to be free from official restraint. They recognize that that's not the law. The question becomes, was that error harmless or was it harmful? The district court in this case – I'm sorry, you've lost me. Where did the government concede? The government in its briefing, pages 13 and 14, conceded that it was improper to argue that the desire to be free from official restraint is the law. They've admitted that the government misstated the law in closing argument. It doesn't have to be – it can be restraint by government agencies, not just by DHS. That's correct. But that has absolutely nothing to do with the point that you're arguing, which is the desire to go to jail in this country. What the government agreed to was that somebody other than the Border Patrol could impose official restraint at the border, like the DEA or whatever, which has nothing whatsoever to do with this case, in which the evidence shows an intent to get beyond official restraint at the border and into jail in this country. It has everything to do with that, because the cases that the government relies upon, that this court has relied upon in outlining official restraint, aren't limited to the border. There's a legion of cases that have to do with Ellis Island, that have to do with people in prisons where – Border control. I'm sorry? That's border control. Official restraint is a border control doctrine to implement the immigration fiction that if you're stopped at the border, you have not entered the country, even though you actually have set foot within the borders of the United States. That's right. It's been used for decades to deny petitioners. So that's what the doctrine of official restraint has to do with. It's a border control mechanism. It's not a crime control mechanism. And what your client said he wanted to do was to get beyond the clutches of official restraint at the border and into the clutches of the Bureau of Prisons so he could be a guest in the federal prison system. Well, what the evidence showed was that Mr. Lombero said, I want to see an immigration judge. Those were the first words out of his mouth repeatedly. The evidence shows that he said he wanted to see an immigration judge to go to jail. And there was no testimony. Did he mean Bureau of Prisons custody? Did he mean immigration custody? The testimony was still jail. It doesn't matter whether or not he wanted to go to Bureau of Prisons custody or whether he wanted to go to immigration custody. Oh, it makes a ton of difference because your entire argument turns on his intent not to get beyond official restraint. Without the permission of the United States government. As we stand here today, there is an INS detainer on Mr. Lombero. He was paroled into the country. There's INS detainers on a bazillion people. That doesn't mean that they're intended to be under official restraint. But if you go to jail, it is only at the pleasure and with the consent of the United States government. Which is just an absurd position. It has absolutely nothing to do with official restraint. Of course, the Attorney General has got to sign off through his designees on every indictment. That doesn't mean that someone is under official restraint because they're indicted. They're under restraint, but not under the doctrine of official restraint. No, official restraint, as the Court pointed out, began with, for decades, courts denying immigration petitioners the right to deportation proceedings. What this Court held in Pacheco, Medina, was that what's good for the goose, it has to be applied in a criminal context as well to enter the country. Look, just so you really understand, I really want to hear you face what I'm saying. Because you may have an argument. I want to hear it. The doctrine of official restraint is a border control mechanism. If somebody comes over the border and is caught at the border, is under continuing surveillance and is caught at the border, we deem them not to have entered the country. So they are therefore excludable rather than deportable. And for criminal purposes, they haven't entered the country. That's right. But my proposition to you is what your client said he wanted to do was to go to jail. Right. Totally different. He wanted to be restrained for whatever the reason, but that's not official restraint under the immigration doctrine. That's just plain, dirty, ordinary part of the United States population that goofs up and gets put into prison. Your Honor, I disagree with that proposition because... Why? Because the cases where someone is either held in prison in the United States or they're held in a ship or they're held in any number of detention facilities, they are inside the United States. So it's not like every person... At the border. I disagree, Your Honor. Not every... In what case can you cite to me where someone's in jail other than a found-in case? And they're found in prison. I was on the panel. I can't remember the case. You're found in a prison interior in the United States. You're not under official restraint. I think you are under official restraint, Your Honor. No, you're not. Well, there is a case I know for certain from Ellis Island. Of course, but that's the border. Well, it's... What do you think Ellis Island is? It's not, you know, a pleasure spot. Right. It's where people are processed who are trying to get into this country or were at the time. Simply put, being inside a jail is not the freedom to mix and go free among the population in the United States. There's two components to it. You're going amongst the... And they may be in jail. They might be in a hospital. They might be in all sorts of places where they have very little freedom to move. But my point is that's just a play on words. Well, I disagree. I think the fundamental question is, is a person who's inside the United States only because they were paroled in for prosecution, have they entered in the immigration sentence? And the answer to that is no, they haven't. He would be denied a deportation hearing if his only claim was, I'm here by virtue of being paroled in to the United States. I can't imagine an immigration judge giving him the full panoply of process because he was paroled in at the pleasure of the United States to stand prosecution. I don't think that an immigration judge would vest him with the rights that attend to being in the United States, having entered the United States. It's not a play on words. Judge Reimer's talking about his intent. Right. And his intent was not to come under the clutches of the INS, but rather to come under the clutches ultimately of an incarceration institution. There's no evidence to say one way or the other. And in fact, frankly, the part about being in jail was something that arose rather late in the day. That wasn't in any reports. That was kind of a late theory that the government presented a trial. Be that as it may, it doesn't matter because first, he didn't say whether or not he wanted to go to immigration custody or he wanted to go to VOP custody. But the point is, he can't get there unless he actually gets arrested and sent there with the permission of the United States. I mean, the facts are unique in that he didn't try to sneak into the country and he wasn't trying to wander around free. He actually went up to the only border patrol agent that was in the area, raised his hands and said, I want to see an immigration judge. I want to go to jail. That is not an attempt to enter in the legal sense. Your Honor is right that it does turn on his intent. And his intent was not to try to sneak into the country, which is what the law requires. His intent was to go up to the judge, or excuse me, to the border patrol agent and come what may, either see a judge or go to jail. But either way, that's not the intent to enter the country in the immigration sense. I'll reserve my remaining minute. Surely. May it please the Court. My name is Deliana Chobano and I'll be representing the government in this matter. I apologize for that. I just want to start off with clarifying two points. The test counsel implies that this jail statement came out rather late in the trial. This was a surprise. It was not a surprise. During a motion hearing for the suppression of the statements that the defendant made, this jail statement came out, as well as the part that he wanted to see an immigration judge. And so the defense counsel was unaware, even before the trial, at the motion hearing, that Avila had stayed, that the defendant had told Avila this when he was out in the field. And actually, the prosecution wasn't even going to bring out these statements at trial, except to show alienage. The part about his saying that he was a Mexican national, he had no immigration documents, he knew he was in the country illegally. The prosecution, it's clear from the transcript, was planning on not bringing up at all the comment that he wanted to see an immigration judge, that he wanted to go to jail, unless the defense decided to bring it up as its defense. And so if you actually look at the testimony, it was defense who brings out the jail comment first in opening statements before the jury. So the jury was on notice already that there was a statement about his wanting to go back to jail, as of the opening statement made by defense counsel. Counsel, I want you to slow down. Oh, sorry. I appreciate your speech, but I would like you to read from your red brief exactly what the concession was that the government made. Lombero is correct that custody at the border by any government agency is official restraint. That is our concession. But we believe that he is right, that his intent, even if you take him at face value, that his intent, and I'm sorry, that was at page 22 of our brief, if his intent was to go to jail, then it necessarily involves an intent to take steps that were easily consistent with that intent to go at large in the country to satisfy that. So if Agent Avila had said, I'm sorry, I don't want to put you into official custody, I'm just going to turn around and you do whatever you want to do, then he could have gone forward to the secondary fence. There's testimony in the record that other aliens have scaled the fence, have been able to squeeze through the pillars in the secondary fence. This is not an insurmountable fence to get into the United States. He also could have very easily decided to either turn east or west and continue walking until he hit another border patrol agent. And if Agent Avila isn't looking at him and the next border patrol agent isn't at least 750 yards away, then he would be outside of the constant surveillance of that area. And so he would be at large in that period. The United States recognizes that in order for there to be entry, you have to actually cross the border and to be at large. And if there's not constant surveillance, then he's at large, even if he's in between the primary and secondary fences. I also want to reiterate that there's an alternative theory. I really do want you to slow your speech down just a little bit. Sure. Are you saying that he was free for a period of time, therefore he wasn't in official restraint? Although we believe that the facts of this case could support an entry indictment, this case was not prosecuted on illegal reentry, but on attempted illegal reentry. So I'm saying that my example about his going east or west or continuing forward past the secondary fence is that at the time he was approaching Agent Avila, he didn't know how Agent Avila was going to respond to his request to see an immigration judge and to go back to jail. He certainly knew that the agent wouldn't allow him to enter the country freely. He knew that. Well, something could have happened to Agent Avila before he got up to Agent Avila. There were 200 yards of distance between where the defendant originally was and where Agent Avila was, and it's telling that the defendant did not stay on the Mexican side of the border, walk up to where the border patrol car was, and then cross the fence and say, can you take me into custody? I want to go to an immigration judge. I want to go to jail. Instead, he crosses over 200 yards away, which, interestingly enough, if you read the trial testimony very carefully, that's where the vehicle gate was, because the vehicle gate was 200 yards west of Agent Avila. And so it's theoretically possible, this evidence supports that he would have tried to sneak in behind the vehicle that triggers the opening of the secondary gate. So that suggests that he was trying to sneak in, as well as there's other evidence in the record that suggests that his initial intent was to sneak in. But even assuming that his intent was to walk up to Agent Avila and ask to go into custody, something could have happened in that 200-yard period where he's walking up to Agent Avila. Agent Avila could have gotten an emergency call and had to leave the area because there were hundreds of people trying to cross further down the road, and so they had to divert resources. So if he's in that situation, well, if he intends to go to jail, then what would he do? Well, he can either cross over to the secondary fence, which in there's testimony that aliens have done this in the past, in order to find an official on the other side of the border who would eventually take him into Federal Bureau of Prison Custody, or he could have continued walking east or west outside of the constant surveillance of any individual, any official individual, until he found an official. And that would have been an intent to be at large, conditionally, until he realized his intent of finding someone who could take him to jail. And I honestly believe that he intended to, you know, try to sneak into the country because he didn't try to go over, he didn't cross one-and-a-half miles east where the border, where the Port of Entry San Ysidro is, he didn't cross, he didn't walk down the back... This is all speculation. Yes. Let's deal with what he did. Yes, yes. I appreciate that, Your Honor. But the facts suggest that he did try to sneak. He didn't cross where the agent was. He crossed 200 yards away. He waited until the agent turned back to the east to cross. So the agent didn't see him for 10 to 15 seconds when he crossed the fence. We know he had documentation saying, these are the ways you have to, if you want to apply for permission to re-enter the country, this is what you need to do. You need to apply for this documentation. You need to get the Attorney General's consent. And he did not do that. He instead crosses the primary fence when the agent is not looking 200 yards away. This suggests an intent to sneak into the country. Most likely what happened is he crossed over and then realized belatedly that he wasn't going to be able to successfully run away. We have these prior convictions in the record. He knew what the consequences were. So we might as well just realize the jig is up, walk over to the agent and say, I want to go to jail, so then he can get a downward departure for surrendering himself in acceptance of responsibility, which is exactly what happened in this case. He got a two-level and a four-level deduction for that behavior. So that's most likely what's going on here. But my point is, regardless of what the jury believes, whether he was lying and he actually did try to sneak into the country, and we believe that there's substantial evidence to support that theory, or whether they took his statement at face value, in reality, they would have accepted that he would have taken steps easily consistent with that. All of that, and let's get to the bottom line. Let's assume we take your concession for what it is, and the jury was told, and we know the jury was told, that it wasn't instructed properly on the law. So what's the remedy here? Remand for a retrial with the proper instruction? We don't concede that the jury instruction was improper. We believe the jury construction was an accurate statement of the law. The model jury instructions don't even define entry or re-entry, and the district court judge here went above and beyond the call of duty by actually providing that definition. And it's an accurate statement of the law. An alien enters or re-enters the United States when they actually cross the borderline and are free to go about, that is, go at large or at will, within the United States. And just so you know, that's in page 12 of our brief, if you want to take a look at the jury instruction. And that's, it's accurate. It gets the idea that you don't have, it's not just physical crossing of the boundary that gets you into the country, but also the ability to be at free or at large. And as long as he had that intent, then the jury would convict him. So if they believed him that, you know, he was going to, if they didn't believe him and he was really trying to sneak into the country, then this jury instruction satisfies that, he was trying to sneak in, and the evidence supports that. Alternatively, if the jury took his statement at face value,  then that would also satisfy that, because the Supreme Court has recognized in the United States v. Holloway case that there's such a concept as conditional intent. And if he would have had the conditional intent to take steps easily consistent with his ultimate intent of going to jail, if he hadn't had the opportunity to be put into custody with Agent Avila, he'd already taken that first step by crossing the primary fence. If Agent Avila was not going to take him into custody, it wouldn't have been very hard for him to try crossing the secondary fence. People have squeezed through and climbed over in the past. That's actually slopes toward Mexico, making it, I think, easier to scale, even though it's only about 15 feet high. Or he could have continued walking east or west outside the constant surveillance of an agent, and conditionally he now expresses an intent to be at large, until he finally reaches an agent who's willing to take him to jail. But that's not what happened here, and that's not what was presented to the jury. He went up to this agent, and this agent met him. In the United States v. Holloway, the Court emphasized that it's not the issue of what happens once the other side, you know, acts, and the condition is fulfilled or it's not fulfilled. In the United States v. Holloway case, you have to add the issue was the defendant testified that if the victim would not turn over the car keys, then he would intend to, you know, harm the victim. And he doesn't know at that point before the victim has acted and responded, whether or not the car keys are going to be turned over, or whether he's going to have to commit violence. And the Court found that's sufficient for conditional time. We have to look at that similarly here. The defendant, Lombera, did not know prior to walking up to Agent Avila and actually making contact with him whether Agent Avila would still be there, whether he would be called away. He was 200 yards away. It's possible Agent Avila could have been called away. You know, maybe Agent Avila could have had a heart attack or something. It's not clear up until Agent Avila put him into custody that for sure he was going to be put into custody. So he had a conditional intent to go at large within the United States, taking steps easily available to him to effectuate that intent, until he was able to find someone who would put him into federal custody and take him to jail. Well, the jury instruction says, specifically calls out Department of Homeland Security and says if he went into their hands, then it would have been an official restraint, based on, and that was an objected to instruction and the defense objected to the argument based on that misapplication of law. Right. I would like to flag, since there's an emphasis on that, that if you look at the first jury instruction that we're quoting from his brief. Yeah, we have questions answered. Thank you, Your Honor. I wanted to provide the sites that I didn't have at my fingertips to answer the question that a person inside the United States is under official restraint. And the first case is Kaplan v. Todd. A 1925 Supreme Court decision, where the quote is, an excluded alien present in the United States for nine years, quote, was still in the theory of the law at the boundary line and had gained no foothold in the United States. There's a case matter of Yam, which says that an alien who is found at the border, but taken inside by local police to a medical facility, was under official restraint. Now, those cases are on all fours with this case because it was a border case. Mr. Lombera did have the initial contact and intended to have the initial contact at the border. And if he was then taken to jail, the way... He said his intent was to go into the custody of the Border Patrol or the DEA or anybody else who is in control of the border. You're absolutely correct. But that wasn't what his intent was. His intent was to go into custody. Per? Through Border Patrol. It was Border Patrol that he walked up to. Well, he said jail. He didn't say one way or the other. And very briefly, all of the other arguments that the government describes about the agent could have had a heart attack or he could have gone through the vehicle gate or whatever were not argued at the district court level. The question isn't what could the jury have convicted Mr. Lombera of or what theory could they have convicted on. It's what did they convict him on. So what's the remedy here? Retrial? The remedy... Well, retrial certainly. But I would submit that under the correct view of the law, based on these facts, there's insufficient evidence to show that he meant to go at large and at will in the United States. The prosecutor urged conviction on an unlawful basis. Thank you, Your Honor. Okay. Thank you. Thank you, Counsel. The matter just argued will be submitted.       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: B. Fletcher, Rymer, Fisher